# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

FREDDIE JONES,                      )
                                   )
    Plaintiff,          )
                                   )     **Case No. 3:12-cv-1089**
v.                                 )     **Judge Aleta A. Trauger**
                                   )
UNIPRES, U.S.A., INC.              )
                                   )
    Defendant.,         )

## MEMORANDUM

Defendant Unipres, U.S.A., Inc. ("Unipres") has filed a Motion for Summary Judgment (Docket No. 25), to which the plaintiff, Freddie Jones, filed a Response in opposition (Docket No. 31), and Unipres filed a Reply (Docket No. 36). For the reasons stated herein, the motion will be granted and Jones' claims will be dismissed with prejudice.

## BACKGROUND[1]

### I.    Overview

Jones worked at Unipres as a "Press Operator" and in other capacities from 1988 through

---

[1]In support of its motion, Unipres filed several deposition transcripts with attached exhibits to each deposition (Docket No. 25, Exs. A (Freddie Jones deposition transcript), B (Jeff Woods deposition transcript), C (Brian Keen deposition transcript), D (Thomas Bonebrake deposition transcript), and E (Janna Finley deposition transcript)), a Memorandum of Law (Docket No. 26), and a Statement of Undisputed Material Facts (Docket No. 27) ("Unipres' SUMF"). In support of his brief in opposition, Jones filed a Response to Unipres' SUMF (Docket No. 32), an additional Statement of Undisputed Material Facts (Docket No. 33) ("Jones' SUMF"), and additional evidentiary records (Docket No. 34). Unipres filed a Response to Jones' SUMF. (Docket No. 37.) Unless otherwise noted, the facts are drawn from the parties' SUMFs and the supporting evidentiary materials, taking into account the parties' respective objections thereto and drawing all reasonable inferences in favor of Jones, the non-moving party.

1

his termination on August 17, 2011.[2]  Jones claims that one of his supervisors, Brian Keen, made age-based discriminatory comments to him between October 2010 and June 2011, which Jones did not report to Unipres.  In June 2011, in front of Press Department Manager Jeff Woods, Jones had an altercation with another of his supervisors, Thomas Bonebrake, which Bonebrake and Woods did not report at the time.  On August 9, 2011, Jones had an altercation with Keen, in which Jones stated that he could not respect Keen because Keen was a "wife beater."  After Keen reported the incident to Bonebrake, Unipres undertook an investigation into the incident and placed Jones on administrative leave pending the results of the investigation.  During the course of that investigation, Jones reported that Keen had made age-based discriminatory comments to him in the past, and Bonebrake and Woods told Unipres about the June 2011 altercation.  After completing its investigation, Unipres terminated Jones, ostensibly because of the two altercations with his supervisors.  Jones was 47 years old when he was terminated.

Jones asserts claims against Unipres under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  Although his Complaint and briefing is not a model of clarity concerning his theories of liability, Jones appears to claim that Unipres violated the ADEA in three ways: (1) by terminating Jones because of his age, (2) by terminating Jones in retaliation for reporting, on August 10, 2011, Keen's previous ageist comments, and/or (3) by refusing to remedy a hostile work environment created by Keen between October 2010 and June 2011.  Unipres has moved for summary judgment on all of these claims.

_____

[2]Likely because it has negligible bearing on the instant motion, the parties' briefs do not describe Jones' day-to-day responsibilities or the nature of Unipres' business.  Based on deposition testimony in the record, it appears that Unipres manufactures automobile parts and that Jones worked as a metal fabricator during the relevant time frame.

2

## II.    <u>Detailed Facts</u>

During the time frame relevant to this lawsuit, Woods was the Press Department Manager, Bonebrake was the Press Section Manager (reporting to Woods), and Brian Keen was the Press Area Manager (reporting to Woods and Bonebrake).

Jones testified that, in October 2010, February 2011, and June 2011, Keen made age-based discriminatory comments to Jones.  In October 2011, in front of Jones' co-workers, Keen on three occasions called Jones a "has been", told Jones that he was "half the man [he] used to be," and said that he would "whup [Jones'] butt."  In February 2011, on one occasion, Keen again called Jones a "has been" and stated that, "if he [Keen] could hang with [Jones,] he could whup [Jones'] butt."  (*Id.* at 19:6-12.)  Third, in June 2011, Keen made similar statements to Jones.  Although Jones believed that these comments constituted harassment based on Jones' age, Jones did not report the comments to Unipres.  Jones stated at deposition that he subjectively feared that, instead of correcting the issue, Unipres would have terminated him for reporting the comments.

On June 2011, Jones had an altercation with Bonebrake, which Woods witnessed.  Although Woods verbally counseled Jones for his conduct in that altercation, neither Bonebrake nor Woods formally reported the incident at the time it occurred.[3]

On August 9, 2011, Jones had an altercation with Keen.  Keen had scheduled a 6 a.m.

---

[3]As described in the next section, Unipres' Human Resources Department ("HR") collected information during its investigation of Jones' August 9, 2011 altercation with Keen.  In the course of that investigation, Woods and Bonebrake reported the June 2011 incident to HR.  In the next background section, which details the information provided to HR during its investigation, the court will address the details of the June 2011 incident, as Woods and Jones reported it in August 2011.

3

meeting that morning, which Jones missed. Following the meeting, Keen confronted Jones and, according to Jones, "got in [Jones'] face" and yelled at him. When Keen asked why Jones had missed the meeting, Jones told Keen: "It's hard for me to respect a wife beater."[4] Keen walked off to alert Bonebrake about the incident. From Bonebrake's office, Keen paged Jones twice over the intercom, but Jones did not respond. Bonebrake then paged Jones to come to his office, which Jones did. In Keen's presence, Jones admitted to Bonebrake that he told Keen, "[i]t's hard for me to respect a wife beater." Bonebrake told Jones that he "couldn't be saying these things," which Jones construed as Bonebrake "more or less telling me that I couldn't talk to Mr. Keen in that way, that manner." (Jones Dep. at 35:3-18.) Jones told Bonebrake that he understood.

About ten minutes after that meeting concluded, Keen approached Jones to tell him that Bonebrake wanted to see him again. As Keen escorted Jones to the front office, Keen was confrontational with Jones, talked down to him, and seemed "proud of himself."

### B.    Finley's Investigation

Janna Finley, Unipres' HR Manager, met Jones at the front office and questioned him for about 20 to 30 minutes.[5] During the meeting with Finley, Jones admitted saying to Keen that "[i]t's hard for me to respect a wife beater." (Jones Dep. at 34:5-56 and 43:3-8.) Jones

---

[4]At some point before the August 9, 2011 altercation with Keen, Jones had allegedly read in a newspaper (perhaps through an online internet search) that Keen had been arrested for domestic abuse "a couple times." (Jones Dep. at 32:17-23; 104:25-106:5.) Jones later told HR that his wife's previous spouse was "an abuser so I am sensitive to this issue," which he testified was a true statement. (*See* Jones Dep. at 106:9-14.)

[5]Jones testified that he is not sure whether Bonebrake was present at the front office when Jones arrived there. (Jones Dep. at 72:22-23 ("Q: Was Mr. Bonebrake there? A: I think it was just me and Ms. Finley. Maybe [Bonebrake] was. He might have been there.")

4

complained to Finley about Keen's conduct, stating that Keen "says things like 'you will do this,' 'you are doing to do that.' He has no respect for his employees." (*Id.* at 45:13-17.) Jones also told Finley that "[i]t is hard for me to respect someone who has done the things [Keen] has: Would I be here if I had been arrested for spouse abuse and all this other abuse of employees?" (*Id.* at 4-8; *see also id.* at 54:17-20.) Following the meeting, Finley took Jones' security badge, instructed him to leave the premises, and told him that she would be conducting an investigation. Jones left the premises between 7:30 a.m. and 8:00 a.m.

On August 10, 2011 (the next day), Jones returned to the plant. Jones' security badge was not at the guard station, where Jones claims that Finley had told him it would be.[6] Bonebrake accosted Jones, reminded him that Unipres was investigating the incident, and advised Jones to return home and not to return to work until Unipres asked him to return. (*Id.* at 82:17-24.) Jones believed that his job was in jeopardy. (*Id.* at 82:25-83:9.) In the course of the conversation, Jones told Bonebrake about age-based discriminatory comments allegedly made by Keen. This constituted the first time that Jones reported those incidents to Unipres management. After speaking with Bonebrake, Jones left the premises with the understanding that the investigation was ongoing.

In addition to interviewing Jones on the morning of August 9, 2011 (immediately after the incident with Keen), Finley compiled additional information concerning Jones' conduct. Her records included the following documents:

---

[6]Finley testified that she placed Jones on administrative leave pending the results of the investigation. However, Jones claims that Finley told him that he could pick up his badge and return to work the next day, even while the investigation continued. (Jones Dep. at 75:11-13 ("Ms. Finley told me that my badge would be at the door, at the guard shack the next morning, just come back the next morning.").) This factual dispute is not material.

5

- August 9, 2011 notes reflecting a call from an unknown source (likely Woods or Bonebrake) stating that Jones had "started yelling at Brian [Keen] . . . in front of other [employees] – things about Brian's personal life [–] child molester, wife abuser, etc." (Finley Dep., Ex. 1.)

- An August 9, 2011 email from Keen to Finley describing the incident, in which Keen stated that "[Jones] said it's hard to go to the meeting when I don't respect you. I said what you talking about Freddie. He started yelling things about my personal life and I told him to come with me to the office and he did not come." (*Id.*, Ex. 2.)

- An August 9, 2011 email from Bonebrake, stating that "Freddie had a very bad out burst [sic] this morning. Freddie . . . started screaming personal things about Brian's life. He was screaming that Brian should not even be working here, that he is a wife beater, and that he is a child molester . . . . That is when Brian came to see me in the Press Production Office. Brian paged Freddie over the intercom 2 time[s] to come to the Press Office. With no response from Freddie, I picked up my phone and paged Freddie to call me . . . . He came right up. I sat Brian and Freddie down and asked Brian Keen to tell me his story, then I asked Freddie to tell his story. Freddie said that was exactly what had happened. He expressed to me that he has absolutely no respect for Brian. I explained to Freddie that despite what kind of personnel fillings [sic][7] he has toward Brian outside of here that as long as we were at work and Brian Keen is a member of Management here at Unipres then he needed to respect Brian is a Manager . . . . I let him know that these kinds of out burst [sic] are unacceptable and that it would not be tolerated any more. That I could not allow a hostile work environment for him or a member of management." The email also stated that Jones "had an Out burst [sic] just like this about a month ago with me. He came walking up to me and Jeff Woods back in rework and started screaming 'your [sic] a damn liar, your [sic] a damn liar.' I told him that he had better calm down. I talked to him and let him know right then that he could not have these kinds of out burst [sic], causing a hostile environment." (*Id.*, Ex. 3.)

- Notes from her August 9, 2011 interview with Jones, which Jones signed and dated. In most relevant part, the notes include notations that Jones told Keen "I don't respect you" and that Jones said "[i]t is hard to respect someone who has done the things he has – Would I be here if I had been arrested for spousal abuse? And all of his other abuse of employees?" The notes also indicate that Jones told Finley that "I have never had a

---

[7]Bonebrake apparently meant to write "personal feelings."

6

problem with Thomas Bonebrake," although he and Bonebrake "had one disagreement a few weeks back, but it was resolved." (*See* Finley Dep., Ex. 4.)

- August 9, 2011 typewritten notes stating that, after leaving the premises, Jones had called Unipres to add to his earlier statement the following statement: "My issues with Brian Keen go way back. This is a continuing thing with him. Years ago, he told me that my step daughter was 'easy'. I also know that he has been arrested for abusing his wife. I have no respect for this man. Fairly recently been calling me a 'has been'. This happened on numerous occasions and says this in front of others. Witnesses I can remember are Craig Cole, Kevin Steward [sic], and Charlie Smith."

- An August 9, 2011 typewritten statement by Brian Keen (signed and dated by Keen), stating, according to Keen, that Jones told Keen "it was hard to go to a meeting when you have no respect for the person who you are working with," and that Jones "began yelling about me being a [c]hild molester and then said wife abuser and I shouldn't be working here at Unipres." Keen also provided an account of the meeting with Jones in Bonebrake's office, including Jones' refusal to respond to Keen's attempts to page Jones. Keen also stated that, "with respect to the 'has been' comment. We were laughing and talking about when we were younger (fighting and things). My comment in response was that we are more mature and are 'has beens' now."[8] (*Id.*, Ex. 5 at pp. 1-2.)

- An August 9, 2011 typewritten statement from Bonebrake (signed and dated by Bonebrake), stating that Jones had refused to respond to Keen's attempts to page him, that Jones "completely agreed with Brian's statements" about the altercations, and that Bonebrake had told Jones that "he cannot talk to management like this. He cannot yell at his supervisor and bring up another person's personal business. This kind of behavior has no place at work." (*Id.*, Ex. 5 at p. 3.)

- An August 9, 2011 typewritten statement from Craig Cole (signed and dated by Cole), stating that, "maybe a month ago, they (Freddie and Brian)

---

[8]Keen and Jones grew up in the same area and knew each other before working at Unipres. Jones graduated from Portland High School in 1982 and Keen graduated from the same school in 1988. (The dates of birth for Keen and Jones are redacted in their deposition transcripts). Thus, it appears that Keen is about six years younger than Jones, which would have made Keen approximately 40 years old during the time frame relevant to this lawsuit. Keen testified that, although he and Jones were not high school friends, "I knew Freddie when he was a kid, and I was a kid." (*See* Keen Dep. at 14:15-16:5.)

were talking about when they were back in school and they were apparently pretty wild . . . . They were cutting up and laughing about it. Brian made the statement that was a long time ago and said Freddie is a 'has been'. I didn't take it as a derogatory remark. They were both laughing about it. There didn't appear to be any animosity between the two of them. They appeared to be just having fun." (*Id.*, Ex. 5 at p. 4.)

- An August 9, 2011 Statement from David Crowson (signed and dated by Crowson), who witnessed Jones' altercation with Keen. Crowson stated that Jones "was yelling very loudly at Brian and Brian was trying to calm him down. Then Brian said something about Freddie going with him to the back and motioned for him to come with him and Freddie just stood there and started welding. In a few minutes I heard Brian Keen calling him over the intercom and then Thomas Bonebrake was paging him over the intercom and he went toward the back." (*Id.*, Ex. 5 at p. 5.)

- An August 9, 2011 typewritten statement from Kevin Stewart (signed and dated by Stewart), stating that "I don't recall Brian ever calling Freddie or anyone else a 'has been'. We do sit around at breaks and lunch, and laugh and talk about various things, but I don't ever recall this kind of conversation." (*Id.*, Ex. 5 at p. 6.)

- An August 9, 2011 typewritten statement from Woods (signed and dated by Woods) concerning the June 2011 incident with Jones and Bonebrake. Woods recalled that, "[t]he week of June 27th, . . . Freddie came up really fast and got right in Thomas's face and put his finger in his face and called him a dam [sic] liar 3 or 4 times . . . . Freddie got right back in Thomas's face and told him he was a damn liar and you know what I am talking about. He kept repeating it over and over. He was yelling loudly – several others could hear it . . . . I told Freddie that he had to calm down and talk about it before he came out and just blasted someone. He immediately calmed down and apologized. I told him before you get this upset, you need to come to Brian, Thomas or myself and not just explode on the shop floor in front of others." (*Id.*, Ex. 5 at p. 7.)

- An August 9, 2011 typewritten statement from Bonebrake (signed and dated by Bonebrake) concerning the June 2011 incident. Bonebrake stated that, on approximately June 24, 2011, while Bonebrake and Woods were together, "Freddie came stomping back and got up in my face pointing his finger at me saying 'management sucks. You are a damn liar[.]' He said that at least twice and I told him to hold on and calm down . . . . I asked Freddie what his problem was and he said that I had lied to him . . . . I told him his means of communication was not going to be tolerated. He finally calmed down and I told him this kind of behavior

8

was insubordination . . . I talked to him about his demeanor and his approach to the situation. He seemed to understand, he apologized, and cried. He seemed truly sorry about what happened. I considered this a counseling session and didn't really feel like anything of this nature would ever happen again with Freddie." (Bonebrake Dep., Ex. 1.)

- An August 9, 2011 typewritten statement from Woods (signed and dated by Woods), stating that "Freddie . . . has shown recently on two fairly close dates that he is volatile and deals with his frustration with angry outbursts directed toward supervisors . . . . I don't know what is going on with Freddie, but as a Department Manager, I feel that we cannot tolerate this kind of behavior toward any supervisor at Unipres. I also feel that Freddie's anger toward management is extreme, and if he were placed in another department, he would find a way to get back at Brian and maybe attack him or have another angry outburst or something more violent toward someone else at Unipres . . . . Heated argument, including yelling at our Supervisors in a disrespectful manner . . . cannot be tolerated from anyone. I do not see anyway [sic] to keep him at Unipres, and make it work." (Finley Dep., Ex. 7.)

- An August 10, 2011 typewritten statement from Bonebrake (signed and dated by Bonebrake), in which Bonebrake discusses his interaction with Jones that morning. Bonebrake reported that, when he spoke with Jones that morning, Jones "started talking about Brian Keen and that he had been on the internet and found out that Brian had an arrest record. He was saying that Brian was a wife abuser, had been arrested and he (Freddie) had no respect for him (Brian). He also said that Brian was harassing him. He was just rambling on wasn't making much sense, but just kept on and on about Brian having an arrest record and being a wife abuser and he (Freddie) not having any respect for him (Brian)." (Bonebrake Dep, Ex. 4.)

- An August 10, 2011 typewritten memo from Bonebrake to Finley (signed and dated by Bonebrake), stating as follows: "In response to your question when Freddie confronted me before shutdown [*i.e.*, the June 2011 incident], did I feel threatened? You bet I did! He came rushing up to me with his teeth barred [sic] and his face was red. He was extremely angry with me. He was yelling at me and was wagging his finger in my face telling me that I was a 'damn liar.' I really felt like he was going to punch me and I was braced for it. I can't describe to you the look on his face – he was really out of control . . . . At the time, I really thought that I calmed him down and handled the situation, but obviously I should have called you." (Bonebrake Dep., Ex. 5.)

- An August 11, 2011 typewritten statement from Charles Smith (signed and dated by Smith) concerning the altercation between Jones and Keen. Smith stated that he saw Keen approach Jones and state, "You will be at my meetings," which

Smith recalled was "said like it was an order[.]" However, Smith stated that he "only overheard the part about the meetings" and "didn't hear any more of what was said" because he walked away after the initial comment by Keen. Smith added that "[w]hat is going on between Freddie and Brian is personal - it is not work related." (Woods Dep., Ex. 5.)

## C.    Termination Decision

The Unipres Employee Handbook in effect during the relevant time frame (Jones Dep., Ex. 13 ("Handbook")) outlines a progressive discipline policy, which includes an initial counseling session, followed by a documented verbal warning advising that failure to correct the issue could result in disciplinary action, a written warning notice, and a "last chance warning." The Handbook states that, at Unipres, "unprofessional behavior cannot be tolerated" and that, "while the Company will follow progressive discipline in most situations, *it reserves the right to terminate an employee in accordance with his or her employment-at-will status without prior warning and without notice*." (*Id.* at 70 (emphasis added).) Finley testified that Unipres "always has the right to jump steps when things get severe or you feel like things are out of control." (Finley Dep. at 32:5-21.)[9] The Handbook also specifies that "[v]iolations of the Code of Conduct will result in one of the following forms of corrective action: . . . (1) Coaching/Counseling session (2) Documented Verbal Warning (3) Written Warning (4)

---

[9]At his deposition, Keen – who did not work within HR – testified that Unipres has a progressive discipline policy, stating that "I think it's like five stages before you can be terminated on a normal procedure *other than some stuff that's misconduct that's obviously not tolerated*." (Keen Dep. at 62:11-63:3 (emphasis added).) In Jones' SUMF, Jones improperly attributes this quote to *Finley*, who, unlike Jones, was qualified to testify about the substance of Unipres' HR policies. At any rate, Keen's statement, to the effect that certain forms of "misconduct that's obviously not tolerated" fall within an exception to the progressive discipline procedures, is consistent with the plain terms of the Handbook. Moreover, Keen testified that Jones' actions were "probably in here under the infraction that may result into other judgment characterizations. It says – I mean, in here it states – I know there's other various things that can happen that don't have to go through the five stages." (Keen Dep. at 63:10-15.)

10

Suspension (5) Discharge[.]"  The Handbook lists various types of conduct that could lead to corrective action, including "[t]hreatening, intimidating, coercing, using abusive or vulgar language, or interfering with the performance of other employees" and "[i]nsubordination or refusal to comply with instructions or failure to perform reasonable duties which are assigned." Finally, the Handbook states that "unprofessional behavior cannot be tolerated."  (*Id.*)[10]

The Handbook also outlines procedures for employee complaints, including complaints by an employee about the employee's immediate supervisor, which first require alerting the "next person in authority" about the issue.  (*See* Jones Dep., Ex. 13, Employee Handbook at pp 58-59.)  The Handbook also states that, "[a]t any time you may seek the advice and guidance of our Human Resources Manager," and that "[d]ifficulties in using this complaint procedure should be brought to the attention of the Human Resources Manager."  (*Id.* at p. 59.)  At deposition, Jones acknowledged that he understood that he had a duty to report allegations of harassment to his supervisors, department manager, human resources, or any member of the Unipres management team.  (Jones Dep. at 11:23-12:6.)

It appears that Unipres decided to discipline Jones and considered options for disciplining him short of termination.  The record contains an unsigned "Last Chance Warning"

---

[10]Yawakama Manufacturing Corporation was the corporate predecessor of Unipres.  A document introduced by Jones entitled "Yamakawa Code of Conduct Procedures Number: HR-E002," states that, "*[e]xcept in violations that are so serious as to be cause for immediate discharge*, corrective action is intended to help improve the individual's observance of the practices and procedures necessary in this industrial environment.  The examples of rule violations and corrective actions set forth below are therefore *not meant to describe the only appropriate action that may be taken . . . .*"  (Emphases added).  Unipres does not appear to dispute that this procedure, although a "Yamakawa" document, applied during the relevant time frame.  Even assuming that to be the case, HR-E002 is, in all relevant respects, consistent with the Code of Conduct set forth in the Unipres Handbook.

11

form that Finley apparently filled out but never issued.  (*See* Woods Dep., Ex. 5; Woods Dep. at 28:17-18 ("Ms. Finley [] discussed the possibility of a last-chance warning.").)  Woods rejected that option.  (*See* Woods Dep. at 29:21-22 ("I didn't feel that this type of action deserved a last-chance warning.").)  The record also suggests that Finley floated the possibility of moving Jones to another department, although Woods rejected that option in his August 9, 2011 statement discussed in the previous section.  (*See* Woods Dep. at 27:20-25; Woods Dep., Ex. 3.)  Ultimately, at an unspecified point on or before August 17, 2011, Woods, Finley, Susan Dye (Unipres' General Manager of Administration), and John Harb (Unipres' President) collectively made the decision to terminate Jones.

On August 17, 2011, Unipres issued a "termination notice" to Jones, which stated as the reasons for termination: "Intimidating, threatening, coercing, using abusive language or vulgar language toward a supervisor" and "Insubordination or refusal to comply with instructions or failure to perform reasonable duties as assigned by a supervisor."  (Finley Dep., Ex. 9.)  The notice described the incident with Keen, stating that Jones had called him "a child molester and wife abuser" in "a populated area of the Press Department so other employees witnessed the yelling scene between Freddie and Brian."  The notice stated that, "[w]hen Brian tried to calm Freddie down and go to the office to talk, he did not go.  He was paged by Brian to come up to the office and did not go to the office until paged by Thomas Bonebrake, the Section Manager."  The notice stated that "[t]his is not the first incident of this nature.  A similar outburst happened before the July shutdown, when Mr. Jones came up to Thomas Bonebrake and started yelling and calling him a 'damn liar' regarding a misunderstanding over a scheduling issue."  Finally, in a section entitled "Impact of Problem on Work and Work Environment," the notice stated that

12

"[t]his kind of behavior on Freddie's part has caused morale issues within the press department as well as other departments.  For someone of Freddie's tenure with Unipres and the fact that he has worked many years in the Kaizen/Press Department is inexcusable."  Jones refused to sign the termination notice.

Keen played no role in the decisionmaking process concerning whether to terminate Jones.  Keen did not recommend that Jones be terminated, Keen did not recommend that Jones be disciplined in any way, Keen did not submit any disciplinary paperwork with respect to Jones, and Keen was not asked his opinion as to what should happen to Jones as a result of the incident.  (*See* Keen Dep. at 37:10-38:1 (stating, *inter alia*, that "I didn't recommend anything.  I told [Bonebrake] what happened.  That's up to HR and them.  I have no control over it."); and 57:7-58:3 (stating, *inter alia*, that "I don't have anything to do with what happens to Freddie Jones, nor, did I talk to Thomas Bonebrake about what should happen to Freddie Jones," and stating that he had no discussions with Woods or Finley about what should happen to Jones).)

At deposition, Jones testified that he believed that Unipres management relied on the statements Finley received in making the decision to terminate him.  (*See* Jones Dep. at 126:16-25.)  Jones also admitted that he had no documentation or evidence to show that Unipres retaliated against him for telling Unipres about Keen's age-based comments.  (*Id.* at 142:6-143:5.) ("Q:  Do you have any evidence whatsoever to show that your termination was in retaliation for making complaints about Keen on August 10, 2011? . . . A.  No.   Q:  Do you believe that you were terminated because you made those allegations about Brian Keen on August 10, 2011?  A: Possibly.")

## SUMMARY JUDGMENT STANDARD

13

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at

14

252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

**ANALYSIS**

**I.**      **ADEA Discrimination and Retaliation Claims**

      **A.**      **Legal Standards**

The ADEA makes it unlawful for an employer to discharge an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also makes it unlawful for an employer to retaliate against an employee for opposing or reporting age discrimination. 29 U.S.C. § 623(d); *Blizzard v. Marion Tech. College*, 698 F.3d 275, 288 (6th Cir. 2012). A plaintiff may show ADEA discrimination and retaliation claims through either direct or circumstantial evidence. Here, Jones attempts to establish both claims through circumstantial evidence.

ADEA retaliation and discrimination premised on circumstantial evidence are both governed by the *McDonnell Douglas* burden-shifting standard at the summary judgment stage. *See Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (discrimination); *Mickey v. Zeidler Tool & Die, Co.*, 516 F.3d 516, 526 (6th Cir. 2008) (discrimination and retaliation). To show discriminatory discharge, the plaintiff bears the initial burden of demonstrating a *prima facie* case by showing that: (1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a significantly younger

15

person.  *Martin*, 548 F.3d at 410.[11]  To show retaliation, the plaintiff bears the initial burden of demonstrating a *prima facie* case by showing that: (1) he engaged in protected activity when making his age discrimination complaint; (2) the defendant knew about his exercise of the protected activity; (3) the defendant thereafter took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Id.* at 491-92.  To show causation for discrimination and retaliation claims, the plaintiff must show that age discrimination and/or the retaliatory motive was a "but for" cause of the adverse employment action.  *See Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167 (2009).

     If the plaintiff is able to make out a *prima facie* case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for [its action]."  *Mickey*, 516 F.3d at 523 (discrimination) and 526 (retaliation); *Blizzard*, 698 F.3d at 802-803.  If the defendant is able to do so, the burden shifts back to the plaintiff to produce sufficient evidence to create a genuine issue of material fact that the employer's proffered justification is a pretext for unlawful discrimination or retaliatory motive.  *Mickey*, 516 F.3d at 526 (discrimination and retaliation); *Blizzard*, 698 F.3d at 282 (discrimination).  "Temporal proximity cannot be the sole basis for finding pretext."  *Seeger v. Cincinnati Bell Tel. Co.*, *LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)).[12]  However,

---

    [11]An allegation that the person was replaced by a younger individual supports an inference of discrimination only if the age difference is significant.  *Blizzard*, 698 F.3d at 282.

    [12]The Sixth Circuit has stated that temporal proximity alone could, in appropriate circumstances, support an inference of causality for purposes of the *prima facie* case.  *Mickey*, 516 F.3d 525.

16

"suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence."  *Seeger*, 681 F.3d at 285 (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)).   A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) was insufficient to warrant the challenged conduct, or (3) did not actually motivate the defendant's challenged conduct.  *Mickey*, 516 F.3d at 526.

When an employee argues that the pretext inquiry has no basis in fact, the Sixth Circuit utilizes a modified version of the "honest belief" rule:

> Under this rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on the particularized facts that were before it at the time the decision was made.  Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held.  An employee's bare assertion that the employer's proffered reason has no basis in fact in insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.

*Seeger*, 681 F.3d at 285 (internal brackets omitted) (quoting *Joostberns v. United Parcel Serv., Inc.*, 166 F. App'x 783 (6th Cir. 2006)); *see also Mickey*, 516 F.3d at 526 (in ADEA case, stating that "the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants . . .  did not honestly believe the proffered nondiscriminatory reason for its adverse employment action.") (internal quotations and citations omitted).[13]  To overcome an employer's honest belief, a plaintiff must show more than a

---

[13]Although there seems to be some confusion among district courts about its application, the "honest belief" rule properly applies only to a "no basis in fact" theory of pretext.  *See Blizzard*, 698 F.3d at 286 (with respect to ADEA discrimination claim, applying honest belief rule to "no basis in fact" pretext theory but not to "insufficient to motivate discharge theory"); *Bhama v. Mercy Mem'l Hosp. Corp.*, 416 F. App'x 542, 553 (6th Cir. 2011) (with respect to alternative pretext theories for ADEA retaliation claim, applying honest belief rule to "no basis in fact" theory but not to alternative "did not actually motivate" theory); *see also Joostberns*, 166 F. App'x at 795 n.5 ("The honest belief rule would not prevent Plaintiff from establishing pretext through methods other than the falsity of the reason offered.")

17

dispute over the facts upon which the discharge was based. *Seeger*, 681 F.3d at 285. The employer's decision-making process under scrutiny is not required to be "optimal or [] leave no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998); *see also Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 514 (6th Cir. 2012) (applying honest belief rule and finding that employer was entitled to summary judgment, where employer "made its termination decision based on particularized facts," the "decision to fire [the plaintiff] was not so questionable that it might be deemed unworthy of credence," and employer "made a reasonably informed and considered decision").

If an employee argues that the employer's proffered non-discriminatory reason for the discharge was insufficient to warrant the challenged conduct, the employee ordinarily must show "by a preponderance of the evidence that 'other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge [of the plaintiff].'" *Blizzard*, 698 F.3d at 286-87 (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).)

Finally, if an employee argues that the proffered reason did not actually motivate the employer, the employee must present "additional evidence" showing that the employer was "motivated by illegal reasons considering both the employer's stated reason and evidence the employer offers in support of such reasons." *Manzer*, 29 F.3d at 1083. "This argument is, essentially, that [the employer's] proffered reasons did not actually motivate [the] discharge.

18

This method of proving pretext requires that the plaintiff admits the factual basis underlying the employer's explanation and further admit that such conduct could motivate dismissal." *Blizzard*, 698 F.3d at 287 n.6 (internal quotation marks, citations, and brackets omitted).

## B. Application

In briefing his claims, Jones runs his discrimination, retaliation, and harassment claims together, making it difficult to assess both (1) which facts he believes support each of the three claims, and (2) why he believes each claim is viable as a matter of law. Furthermore, with respect to his discrimination claims, Jones has failed to specify which theory or theories of pretext he is advancing, nor is any particular theory of pretext self-evident. In applying the retaliation, discrimination, and hostile work environment standards, the court has endeavored to construe Jones' claims in a comprehensible fashion. Even under the court's generous construction of his claims and conceivable theories of liability, all of Jones' claims fail as a matter of law.

### 1. Discrimination

Jones has not shown – or even argued – that he was replaced by an individual significantly younger than he, which is required to make out a *prima facie* case of discrimination. In fact, the evidence in the record indicates that other employees who are approximately the same age as Jones, if not older, replaced him. (*See* Keen Dep. at 61:23-62:3 (stating that Laurel Marshall, who is "probably close to 50," and Lonnie Scott, who is "probably over 50 or around 50," are performing Jones' previous role at Unipres).) Therefore, Jones'

discrimination claim fails on that basis alone.[14]

    2.    Retaliatory Discharge

With respect to Jones' retaliatory discharge claim, Jones has failed to establish the requisite causal connection for his *prima facie* case and, even if he could do so, he cannot show pretext.

    a.    *Prima Facie* Case

Jones cannot meet the causal element of his *prima facie* case for several reasons. Jones has not produced any evidence showing that his reports about Keen's ageist comments, which Jones reported only *after* he had been placed on leave for the altercation with Keen, played any role in Unipres' termination decision. Jones himself admitted under oath that he has no evidence showing that the comment played any role in the termination decision. His unsupported subjective belief that his report about Keen's comments "possibly" influenced Unipres is insufficient to support a causal connection.[15] Therefore, Jones' retaliation claim fails on that basis alone. Furthermore, Jones admitted at deposition that, in addition to his age (allegedly), Unipres relied upon the statements submitted to Finley in reaching its termination decision. Jones cannot prevail on a "mixed motive" theory of causation under the ADEA. *See Gross*, 557 U.S. at 175. Therefore, Jones fails to state a *prima facie* case for that additional, independent

_____

[14]Even if Jones could establish a *prima facie* case – which he plainly cannot – he could not establish pretext for substantially the same reasons discussed in the next section concerning his retaliatory discharge claim.

[15]Moreover, contemporaneous records, including emails, recorded statements, and interview notes, uniformly corroborate Woods' and Finley's testimony that Jones' complaints about Keen's age-related comments played no role in their decisionmaking process.

reason.[16]

Even assuming *arguendo* that Jones could establish a *prima facie* case, Jones cannot establish a genuine dispute of material fact as to whether Unipres' non-retaliatory reason for terminating him was pretext for a retaliatory motive.  Unipres maintains that it terminated Jones because he engaged in two outbursts against his supervisors, including making disparaging accusations about Keen's personal life in front of co-workers and refusing to "respect" Keen's role as a supervisor.  This satisfies Unipres' burden to articulate a legitimate, non-discriminatory reason for discharging Jones.

In his response brief, Jones addresses only the "causal" element of his *prima facie* case but does not squarely reference the pretext inquiry.  Therefore, it is not clear to the court which theory of pretext Jones is advancing to rebut Unipres' asserted grounds for termination.

To the extent Jones is asserting that Unipres' basis for terminating him had no basis in fact, Unipres manifestly held an "honest belief," premised on a reasonable investigation and a considered decisionmaking process, that Jones had engaged in serious misconduct meriting termination.  Upon learning about Jones' conduct in the early morning on August 9, 2011, Finley conducted an immediate investigation into the incident: she interviewed, received, and/or took down multiple statements from Jones, Bonebrake, Woods, and several other potential witnesses

---

[16]Confusingly, Jones argues that his failure to report Keen's conduct before August 9, 2011 – out of a subjective fear of retaliation – somehow establishes the requisite causal connection for his retaliation claim.  The fact that Jones declined to self-report based on a subjective fear of retaliation – notwithstanding his acknowledgment that Unipres provided him multiple avenues through which to complain – does not tend to prove that Unipres ultimately terminated him in retaliation for reporting Keen's comments months later.

21

to that incident. After she received a complaint from Jones – *after* Jones had been placed on administrative leave for the August 9, 2011 altercation – about Keen's ageist statements, Finley also received statements from the individuals whom Jones stated could corroborate his account. In his interview, Jones readily admitted to Finley that he had called out Keen for being a "wife beater." Even after the incident, he continued to press that accusation with Finley and Bonebrake on multiple occasions. Finley also received consistent reports from both Keen and Bonebrake about Jones' conduct on August 9, 2011, both of whom reported that Jones had acted inappropriately, that Jones had yelled at Keen on the shop floor, that Jones refused to "respect" Keen, and that Jones had called Keen a "child molester" (according to Keen) and a "wife beater." Finley also received a report from Woods describing Jones's inappropriate conduct in the June 2011 incident with Bonebrake, including yelling at Bonebrake and repetitively calling him a "damn liar" on the shop floor. Bonebrake provided a similar account of Jones' actions and informed HR that he found Jones' conduct on June 2011 to be inappropriate, aggressive, and physically intimidating. None of Jones' alleged "witnesses" to Keen's ageist comments corroborated Jones. Finley also followed up with Woods about potential options, including a last-chance warning and/or transferring Jones to a new department, both of which Woods rejected. Woods expressed to Finley that Jones's insubordinate, volatile, and disrespectful behavior "cannot be tolerated" and that he could not see any way to retain Jones under the circumstances without risking further outbursts against Keen or other supervisory employees.

The record conclusively demonstrates that, in making its termination decision, Unipres reasonably relied on the information presented to it in the post-incident investigation and that Unipres made a "reasonably informed and considered decision" before terminating Jones for his

misconduct. Although Jones argues that he never called Keen a child molester (only a "wife beater") and that Keen was in fact disrespectful to Jones before Jones called him a "wife beater," a dispute about the underlying facts is insufficient to overcome Unipres' showing that it honestly believed that Jones had engaged in serious misconduct and that the conduct merited termination.[17]

Jones has also failed to present evidence creating a genuine dispute of material fact as to whether his conduct was insufficient to warrant termination (to the extent his arguments can be construed as asserting such a pretext theory). He has not identified any employees, in his protected class or otherwise, who engaged in similar misconduct but were not terminated. Therefore, he cannot prevail on the second pretext theory.

Finally, to the extent that Jones is simply arguing that his misconduct did not actually motivate Unipres' decision to terminate him, he has failed to present "additional evidence" showing that Unipres was in fact retaliating against him for reporting Keen's comments. Jones appears to suggest that the fact that Unipres chose to terminate him rather than engage in progressive discipline shows that Unipres more likely than not had a retaliatory motive. However, by their own terms, the applicable disciplinary procedures contained an exception for

---

[17]In *Vance v. Ball*, 133 S. Ct. 2434 (2013), the Supreme Court refined the definition of a "supervisor" for purposes of imputing liability to an employer for harassment claims. Here, Jones' brief seems to suggest that the *Vance* standard has some bearing on his retaliation claim – which it does not. Furthermore, Jones' subjective belief that Keen was involved in the decision to terminate him (1) is insufficient to create a genuine issue of fact, given that the record contains otherwise unrebutted testimony from multiple knowledgeable individuals that Keen played no role in that decision; and (2) contradicts Jones' own admissions in response to Unipres' SUMF. (*See* Docket No. 32, Resp. to Unipres SUMF Fact No. 57 (stating that it is "undisputed" that Woods, Finley, Dye, and Harb "were the management personnel that decided Plaintiff was to be terminated").)

misconduct "so serious as to warrant immediate termination." The Handbook also explicitly stated that, notwithstanding the progressive discipline mechanisms, Unipres reserved the right to terminate employees – who were employed at will – for misconduct without warning and without utilizing the progressive discipline procedures. Furthermore, the Handbook also states that certain forms of conduct, including "[t]hreatening, intimidating, coercing, using abusive or vulgar language, or interfering with the performance of other employees," and "[i]nsubordination or refusal to comply with instructions or failure to perform reasonable duties which are assigned," constituted grounds for discipline. Finally, the Handbook specified that "unprofessional behavior cannot be tolerated." In light of these provisions and reservations of rights, Unipres did not facially violate its own policies and procedures in terminating Jones.[18] Indeed, Unipres regarded Jones' conduct as the type of unprofessional conduct for which immediate termination – rather than progressive discipline – was warranted:

> We always have the right to jump steps when things get severe or you feel like things are out of control. And, of course, if something . . . like this happens where you've got an employee screaming and yelling at a manager – well, two managers – that's not acceptable behavior. It's just not. Then we get into a situation where he says he can't respect his manager. And you've got to be able to manage. And if you've got an employee that is just out and out and [sic] not going to be managed, there's not a whole lot of places to go with that.

(Finley Dep. at 32:11-21.)[19] Ultimately, Jones' subjective speculation that it is "possible" that

---

[18]Moreover, Jones' position that Unipres is always required to engage in progressive discipline is untenable. Taken to its logical conclusion, Jones is arguing that *any* workplace misconduct at Unipres requires progressive discipline. Under the approach Jones urges, if an another employee had attacked Keen, Unipres could not terminate that employee until his supervisor issued an informal verbal counseling, followed by a documented verbal counseling for a second similar infraction.

[19]Jones apparently filed for unemployment compensation benefits within a few days of his termination. On August 31, 2011, after receiving notification of Jones' claim, Unipres

24

Unipres actually terminated him because of his August 10, 2011 complaints about Keen's age-based comments is insufficient, standing alone, to create a genuine dispute of material fact concerning pretext. Furthermore, the mere fact that Jones was terminated 7 days after he mentioned Keen's age-based comments is not, standing alone, sufficient to create a genuine issue of material fact concerning pretext here. Moreover, there is nothing inherently "suspicious" about the timing of his termination – Jones was already under investigation for serious misconduct when he mentioned Keen's comments, and he has not presented "additional evidence" showing that Unipres terminated him for any reason other than his misconduct.

## II.     Hostile Work Environment

### A.      Applicable Law

To state a hostile work environment claim under the ADEA, a plaintiff must establish four elements: (1) the employee is 40 years old or older; (2) the employee was subjected to harassment, either through words or actions, based on age; (3) the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability

---

submitted a form to the Tennessee of Department of Labor ("TDOL") stating that "[w]e do not want to contest this claim." (Finley Dep., Ex. 11, at Unipres000019.) The TDOL "Agency Decision" states that "claimaint was discharged from most recent work for unsatisfactory job performance. Absent the intent not to perform, does not rise [sic] to the level of work[-]related misconduct." (*Id.*, at Unipres 000017.) Although Jones mentions these facts as a basis for disputing Unipres' SUMF Fact No. 58 (relating to Unipres' stated grounds for terminating Jones), Jones does not actually reference these facts in his brief in response to the Motion for Summary Judgment. Regardless, even taking these facts into consideration, the court does not construe them as sufficient to create a genuine issue of material fact with respect to pretext. As with Bonebrake and Woods' decision not to formally report Jones' June 2011 misconduct at the time it occurred, Unipres apparently did Jones a favor by not contesting his request for unemployment benefits, even though Unipres had valid grounds to do so.

on the part of the employer. *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996). Whether an environment is hostile or abusive is determined by looking at all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 337 (6th Cir. 2012) (ADEA case) (citing *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 23 (1993)). "Both an objective and subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Hale*, 503 F. App'x at 337 (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)).

Unipres argues that it is entitled to summary judgment because (1) Jones cannot show that Keen's alleged conduct was sufficiently severe or pervasive to constitute an objectively abusive work environment; (2) Keen's conduct should not be imputed to Unipres under the *Vance v. Ball* standard; and (3) Keen has not shown that Unipres otherwise "knew or should have known" about the alleged harassment and failed to act.

In *Vance v. Ball*, the United States Supreme Court held that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim, including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 133 S. Ct. at 2443. Here, although *Vance* concerned only Title VII claims, the parties assume that the *Vance* standard for vicarious liability applies to Jones' ADEA harassment claim. Therefore, for purposes of its analysis, the court will

26

assume, without deciding, that the *Vance* standard applies to the ADEA claims asserted here.[20]

In his brief, Jones fails to address how Keen's supervisory role at Unipres comports with the types of "tangible employment actions" required for vicarious liability under *Vance.* Thus, Jones has not shown that Keen had the power to hire, fire, promote, or reassign Jones, or cause a significant change in Jones' benefits.[21] Therefore, Jones has not shown that Unipres should be held vicariously liable for Keen's actions.

Because Keen was not a "supervisor" for vicarious liability purposes, the court must apply the test applicable to co-worker harassment. When the harassing employee is a co-worker, the plaintiff must show that the employer knew or should have known of the offensive conduct but failed to take appropriate corrective action. *Faragher v. Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v . Ellerth*, 524 U.S. 742 (1998). Here, it is undisputed that Jones did not report Keen's comments to Unipres before August 9, 2011, even though Jones alleges that Keen made the comments in October 2011, February 2011, and June 2011. Jones has not produced evidence or provided a coherent argument as to why Unipres should have known about Keen's comments before Jones reported them. Thus, with respect to that time period, Unipres cannot be

---

[20]Because the parties have not contested or addressed the issue in this case, the court expresses no opinion concerning the validity of the parties' joint assumption about *Vance*'s applicability to ADEA claims.

[21]Instead of providing the necessary argument, Jones focuses only on testimony and records showing that Keen was called (and considered himself to be) Jones' "supervisor." Under *Vance*, the test for whether Keen was a "supervisor" for vicarious liability purposes (with respect to Jones' harassment claim) turns on the *powers* that Keen had, not the label that Unipres ascribed to Keen. Indeed, in *Vance*, the Court found that its narrow definition of "supervisor" for vicarious liability purposes would provide clear guidance to parties, the court, and the jury. *See Vance*, 133 S. Ct. at 2450. Notably, the court also stated that, "[u]nder the definition of 'supervisor' that we adopt today, the question of supervisor status, when contested, can very often be resolved as a matter of law before trial." *Id.*

held liable for Keen's alleged harassment.

Once again conflating his theories of liability, Jones also argues that, once Finley and Bonebrake learned about the alleged harassment on August 9 and 10, 2011 – *after* Jones had been placed on administrative leave pending the investigation concerning his altercation with Keen – the only "corrective action" that Unipres took was to terminate Jones. However, as set forth in the previous sections, Jones has failed to present a genuine dispute of material fact showing that (1) there was a causal relationship between his after-the-fact complaints about Keen's age-related comments and Jones' termination, and (2) Unipres' basis for terminating him was a pretext for retaliatory discharge. That is, Unipres' decision to terminate Jones was not intended as any form of "corrective action" with respect to Jones' harassment allegations, because Jones was already subject to potential termination for misconduct that predated his complaints about Keen's ageist comments. Indeed, Jones was already on administrative leave, and "corrective action" against Keen would have served no purpose relative to Jones' employment status at Unipres.

Moreover, Jones has not coherently explained what he expected Unipres to do upon learning about Keen's ageist comments during its investigation of the August 9, 2011 incident. Based on an immediate, reasonably thorough, and competent investigation of the altercation with Keen, Unipres determined that Jones had disrespected Keen and made offensive accusations about Keen's personal life in front of co-workers, and that Jones had similarly engaged in an unprofessional outburst against Bonebrake just a few weeks earlier. Based on that information, Unipres determined that Jones should be terminated. It seems as if Jones is suggesting that, by lobbing in unrelated accusations of past harassment by Keen, Unipres was precluded from

terminating Jones because of Jones' misconduct on August 9, 2011. Jones cites no legal support for this position, which the court finds is plainly without merit.

## CONCLUSION

For the reasons stated herein, the Motion for Summary Judgment by Unipres will be granted and Jones' claims will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge